1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

8

9

10

11

12

13

14

COLBY HUTTON and KELLY RICE, on
their own behalf and all others similarly
situated,

                    Plaintiffs,

     vs.

PODS ENTERPRISES, LLC,

                Defendant.

No. 2:25-cv-02025-RAJ

Honorable Judge Richard A. Jones

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
COMPLAINT

Noting Date:
Thursday, January 29, 2026

15

16

17

18

19

20

21

22

23

25

26

27

PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION
TO DISMISS COMPLAINT

i

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  APPLICABLE STANDARD ........................................................................... 2

III. ARGUMENT ...................................................................................................... 2

A. Plaintiffs Have Sufficiently Stated a Claim Under CEMA. ............................... 2

   i.   The Complaint Sufficiently Pleads Pods' Scheme of Spamming Consumers, like Plaintiffs, with False Time Scarcity Headlines. ........................................................ 3

   ii.  Plaintiffs Sufficiently Alleged Pods' Knowledge of Email Recipients' Washington Residency. ............................................................................................................. 5

B. Pods' Arguments that CEMA is Preempted Fail. ............................................... 6

   i.   Pods' Deceptions Are More Than Bare Immaterial Errors. ................................. 10

   ii.  CAN-SPAM'S Preemption Exception Extends to CEMA's Prohibition Against "Misleading" Content in Email Subject Lines. .......................................................... 12

   iii. Pods' Non-Existent Preemption Standard Does Not Apply. ................................. 15

C. Plaintiffs' CEMA Claims are not Preempted by the Dormant Commerce Clause. ........ 18

D. The Supreme Court of Washington's Decision in *Heckel* Directly Refutes Pods' Assertions Regarding Local Interests and Burden. ............................................... 24

E. Plaintiffs' CPA Claim Survives. ...................................................................... 25

F. Plaintiffs Have Pled Injury Under CEMA, and Pods' Attempt to Dismiss Actual and Treble Damages is Premature. ........................................................................... 25

IV.  CONCLUSION ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. King Cnty.*,
  164 Wash. 2d 640 (2008) ...................................................................................15

*Am. Librs. Ass'n v. Pataki*,
  969 F. Supp. 160 (S.D.N.Y. 1997) ....................................................................22

*Andrews v. Conversion Squared Corp.*,
  2020 WL 3978063 (C.D. Cal. May 8, 2020) .......................................................9

*Asis Internet Servs. v. Consumerbargaingiveaways, LLC*,
  622 F. Supp. 2d 935 (N.D. Cal. 2009) ......................................................8, 15, 16

*Asis Internet Servs. v. Subscriberbase Inc.*,
  No. 09-3503 SC, 2009 WL 4723338 (N.D. Cal. Dec. 4, 2009) ....................8, 15

*Asis Internet Servs. v. Vistaprint USA, Inc.*,
  617 F. Supp. 2d 989 (N.D. Cal. 2009) ...........................................................8, 15

*Balsam v. Trancos, Inc.*,
  138 Cal. Rptr. 3d 108 (Cal. Ct. App. 2012) ........................................................8

*Benson v. Oregon Processing Service, Inc.*,
  136 Wash. App. 587 (2007) ...............................................................................13

*Booth v. Appstack, Inc.*,
  No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ................22

*Brown v. Old Navy, LLC*,
  4 Wash. 3d 580 (Wash. 2025) ...................................................................... *passim*

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
  476 U.S. 573 (1986) ...........................................................................................19

*Brummett v. Washington's Lottery*,
  171 Wash. App. 664 (2012) ...............................................................................18

*Cazarez-Guiterrez v. Ashcroft*,
  382 F3d 905 (9th Cir. 2004) ..............................................................................14

*Daniel v. Lennar Corp.*,
  No. 819CV00452JLSDFM, 2019 WL 8194735 (C.D. Cal. Oct. 16, 2019) .........25

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)...................................................................................22, 24, 25

*Elcon Const., Inc. v. E. Washington Univ.*,
    174 Wash. 2d 157 (2012).....................................................................................18

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...............................................................................12

*Flynt v. Bonta*,
    131 F.4th 918 (9th Cir. 2025) ........................................................................ *passim*

*Gordon. Hoang v. Reunion.com, Inc.*,
    No. C-08-3518 MMC, 2010 WL 1340535 (N.D. Cal. Mar. 31, 2010)................8, 15

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009) ....................................................................... *passim*

*Harbers v. Eddie Bauer, LLC*,
    415 F. Supp. 3d 999 (W.D. Wash. 2019)..............................................................14

*Harrington v. Vineyard Vines, LLC*,
    No. C25-1115 TSZ, 2025 WL 3677479 (W.D. Wash. Dec. 18, 2025) ............14, 18

*Hartman v. United Bank Card, Inc.*,
    291 F.R.D. 591 (W.D. Wash. 2013) .....................................................................22

*Healy v. Beer Institute*,
    491 U.S. 324 (1989).......................................................................................*passim*

*Hypertouch, Inc. v. ValueClick, Inc.*,
    123 Cal. Rptr. 3d 8 (Cal. Ct. App. 2011)...........................................................8, 15

*Isomedia, Inc. v. Spectrum Direct, Inc.*,
    No. C08-1733JLR, 2009 WL 10676391 (W.D. Wash. May 27, 2009)..................18

*Kousisis v. United States*,
    145 S. Ct. 1382 (2025)...........................................................................11, 12, 17

*Littlejohn v. Kaiser Fdn. Health Plan of Wash.*,
    2024 WL 4451955 (W.D. Wash. Oct. 9, 2024) ....................................2, 6, 11, 12

*Martin v. Miller*,
    24 Wash. App. 306 (1979)....................................................................................18

*MaryCLE, LLC v. First Choice Internet, Inc.*,
    890 A.2d 818 (Md. Ct. Spec. App. 2006) (cited by Defendant, Mot.) ...................24

*National Pork Producers Council v. Ross*,
   598 U.S. 356 (2023).................................................................................... *passim*

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ...............................................................................6

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,
   469 F.3d 348 (4th Cir. 2006) .................................................................................8

*Sam Francis Foundation v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) (*en banc*) ................................................21, 22, 23

*Sams v. Yahoo! Inc.*,
   713 F.3d 1175 (9th Cir. 2013) ..............................................................2, 10, 12, 21

*Shade v. Gorman*,
   No. C 08-3471 SI, 2009 WL 196400 (N.D. Cal. Jan. 28, 2009)...........................25

*Silverstein v. Keynetics Inc.*,
   2016 WL 7475616 (N.D. Cal. Dec. 29, 2016), *aff'd*, 727 F. App'x 244 (9th
   Cir. Mar. 6, 2018) ..................................................................................................9

*Smith v. Anastasia Inc.*,
   2014 WL 12577598 (S.D. Cal. Sept. 15, 2014)................................................8, 15

*South Dakota v. Wayfair*,
   585 U.S. 162 (2018)..............................................................................................19

*State v. Heckel*,
   143 Wash. 2d 824 (2001) (*en banc*)..................................................10, 22, 24, 25

*Stephens v. Omni Ins. Co.*,
   159 P.3d 10 (Wash. Ct. App. 2007)......................................................................18

*U.S. Commodity Futures Trading Comm'n v. Monex Cred. Co.*,
   931 F.3d 966 (9th Cir. 2018) ...............................................................................21

*Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*,
   76 F.4th 1164 (9th Cir. 2023) ..............................................................................18

*Wagner v. Spire Vision*,
   2014 WL 889483 (N.D. Cal. Mar. 3, 2014)......................................................8, 15

*Wright v. Lyft, Inc.*,
   406 P.3d 1149 (Wash. 2017).................................................................................16

**Statutes**

15 U.S.C. §§ 7701–7713.............................................................................. *passim*

PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION                    v
TO DISMISS COMPLAINT

Wash. Rev. Code. (RCW) § 19.190.020 ................................................................ *passim*

Wash. Rev. Code. (RCW) § 19.190.030 ................................................................ *passim*

**Rules**

Fed. R. Civ. P.  12 .......................................................................................... 2, 3, 21

**Other Authorities**

Merriam-Webster Dictionary ............................................................................... 13

S. Rep. No. 108-102 ................................................................................... 7, 19, 23

1

## I.    **INTRODUCTION**

2

Washington's Commercial Electronic Mail Act (CEMA) and Consumer Protection Act

3    (CPA) prohibit commercial emails containing "false or misleading information in the subject line."

4    RCW § 19.190.020(1)(b); *see id.* § 19.190.030(1)(b) (CEMA violations are CPA violations). Faced

5    with this clear prohibition, affirmed in a recent decision from the Supreme Court of Washington,

6    *see Brown v. Old Navy, LLC*, 4 Wash. 3d 580 (Wash. 2025), Defendant Pods Enterprises, LLC

7    ("Pods") simply decided to ignore it.

8    Pods relentlessly spams consumers' inboxes with email subject lines larded with caps and

9    emoji that herald the beginning, middle, and merciful end of promotions—*falsely*. "FINAL

10    HOURS! Last Chance to Save this Season" (with an alarm emoji) when the "hours" actually

11    continued the next day. Dkt. 1-2 ("Compl."), ¶¶ 50-52. "This offer expires at midnight! Don't

12    miss out" the day before Pods sent another email, saying "Oops. . . We forgot to end the Sale!

13    (Lucky you!)." *Id.* at ¶¶ 60-61. And so on. *Id.* at ¶¶ 39-62, Ex. A.

14    Feigned mistakes, false deadlines, urgent warnings. When deployed to deceive consumers,

15    these marketing tactics are known as false limited time messages, false time scarcity claims, or

16    false urgency claims, *id.* ¶¶ 30-31, and are a "common way online marketers manipulate consumer

17    choice by inducing false beliefs." *Id.* ¶ 30. Marketers use them because they *work*. *See id.* ¶¶ 30-

18    37. They cause consumers to pay less attention to and think less carefully about their purchasing

19    decisions than they otherwise would, leaving them worse off. *See id.* As deployed by Pods here,

20    these tactics are straightforward violations of CEMA and thus the CPA.

21    Pods presents two straightforward questions of statutory and constitutional interpretation:

22    First, does a federal statute preempting state-law claims "*except* to the extent" that a state law

23    "prohibits falsity or deception" preempt Plaintiffs' claims under CEMA's prohibition against email

25

26    PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION                    1
27    TO DISMISS COMPLAINT

1    headlines with "false or misleading" messages? The obvious answer is no, as the leading decision,

2    *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), confirms. Second, does the

3    constitutional assignment to Congress of the power to regulate interstate commerce prohibit

4    Washington from protecting its residents against deceptive commercial spam? Again the answer is

5    no, as the Supreme Court's recent decision in *National Pork Producers Council v. Ross*, 598 U.S.

6    356 (2023), confirms. Pods' remaining arguments fare no better. The Court should deny its motion.

7    **II.    APPLICABLE STANDARD**

8         On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the well-pled

9    factual allegations are taken as true and all reasonable inferences are drawn in plaintiff's favor.

10   *Littlejohn v. Kaiser Fdn. Health Plan of Wash.*, 2024 WL 4451955, at *3 (W.D. Wash. Oct. 9,

11   2024). The motion must be denied if the complaint states a claim that is "plausible on its face." *Id.*

12   And where, as here, defendant seeks Rule 12(b)(6) dismissal based on an affirmative defense, it

13   must show that "the "allegations in the complaint suffice to establish the defense" and the defense

14   is "apparent from the face" of the complaint. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir.

15   2013) (quotations omitted).

16   **III.    ARGUMENT**

17        **A.  Plaintiffs Have Sufficiently Stated a Claim Under CEMA.**

18        Under CEMA, a company is liable for "initiat[ing] the transmission, conspir[ing] with

19   another to initiate the transmission, or assist[ing] the transmission, of a commercial electronic

20   mail message" to a Washington resident that "[c]ontains false or misleading information in the

21   subject line." RCW § 19.190.020(1)(b). So, under CEMA, "spammers" like Pods "must use an

22   accurate, nonmisleading subject line[s]," or otherwise face liability. *Brown*, 4 Wash. 3d at 588.

23

25

26

27

###### i. The Complaint Sufficiently Pleads Pods' Scheme of Spamming Consumers, like Plaintiffs, with False Time Scarcity Headlines.

Pods' Rule 12(b)(6) facial attack starts with the assertion that Plaintiffs did not allege receipt of certain emails, and, as to those emails, Plaintiffs did not include them in Exhibit A to the Complaint. Dkt. 14 ("Mot."), 4 (regarding emails dated, November 28, 2023, February 18, 2025 and April 7, 2025 (Compl., ¶¶ 24, 52, 61)). This criticism misses the point, on several fronts.

*First,* Plaintiffs aren't challenging a handful of emails. The Complaint asserts that Pods "is engaged in persistent marketing through mass email campaigns across the United States." *Id.* at ¶ 64. And as part of its mass email campaigns, it engages in a "*scheme* to compel consumers to purchase its products," and "lur[e] in consumers through urgent subject headings in emails that do not reflect the true availability of the deal itself," and further, that the specifically pled emails are just "*examples*" of that "scheme." *Id.* at ¶¶ 38-39; *see, e.g.*, *id.* at ¶ 64 ("These *examples* of the commercial emails that Pods has sent consumers containing subject lines with false or misleading statements are attached . . . as Exhibit A."); *id.* at ¶ 49 ("Pods has been sending misleading emails *like this* for years.") (emphasis added). Thus, Plaintiffs have pled a scheme and pattern of similar CEMA violations, and their receipt of certain—but not all—emails offers nothing against the scheme itself, reflected by the emails that Plaintiffs received. Discovery may reveal that Pods sent even more deceptive emails to Plaintiffs and others.

*Second,* the emails on November 28, 2023, February 18, 2025, and April 7, 2025 cited by Pods (Mot., 4) were not pled to demonstrate Pods' actual false or misleading messages. They provide context. Each one demonstrates the deceptiveness of emails that Pods transmitted before. These subsequently transmitted emails show that the previously advertised timing was deceptive: (1) the November 28 email "demonstrate[d]" that "the call to urgency on November 27 was misleading." Compl., ¶ 52; *compare id.* at ¶¶ 50-51 (saying, on November 27, "FINAL HOURS!

Last Chance"); (2) the February 18 email "confirm[ed] that the pressure to purchase on February 17 was entirely contrived." *Id.* at ¶ 61; *compare id.* at ¶ 60 (saying, on February 17, "Offer expires at midnight!"); and (3) the April 7 email demonstrates that an urgent email sent on March 3 (claiming "Final hours") was offering a deal that would be available on a "continuous basis." *Id.* at ¶ 45; *compare id.* at ¶¶ 43-48. Whether Plaintiffs received these contextual emails has nothing to do with whether they received emails that *did contain* false time scarcity messages.

*Third*, Pods' ensuing assertion—that other pled emails are not, in fact, false or misleading (Mot., 5-7)—falls flat. Pods starts with seven emails, including, *e.g.*, emails on March 11 and March 18, 2024: the first stating, in the subject line, that a deal "Ends TONIGHT," the second offering the exact same deal seven days later, on March 18. *Id.* at ¶¶ 54-55. Described *supra*, the March 18 email demonstrates the deceptiveness of the March 11 email. Nor is the deal's factual end date dispositive, as Pods asserts. A "customer in receipt of the March 11 email is urged to buy immediately" and to forgo comparison shopping, thinking that the sale "ends" urgently—when in fact, it was going to be available just a handful of days later. *Id.* at ¶ 58.

Likewise, the emails cited by Pods, starting on February 10, 2025 ("Final hours – Book your move to Seattle today!") and offering the same deal on March 3, 2025, April 7, 2025, and May 12, 2025 demonstrate that February 10 did not comprise the "final hours" for booking a move—a sequence that *necessarily* involves planning, coordination, and contemplation. In fact, Pods repeatedly offered the deal for months. *Id.* at ¶¶ 42-47.

Pods misunderstands the scope of CEMA, under the lens of *Brown*. Plaintiffs do not challenge Pods for the act of "offer[ing] a promotion, end[ing] it, and then offer[ing] a similar promotion weeks or month later." Mot., 5. Indeed, companies may *truthfully* offer deals with similar pricing for a similar product day after day after day. CEMA does prohibit email subject

lines—like those pled by Plaintiffs—that mislead consumers about "*the duration or availability of a promotion*," as recently stated by the state's high court. *Brown*, 4 Wash. 3d at 596.

Pods next posits that these subject lines are "mere puffery." Mot., 5-6. Again, the court in *Brown* disagrees, contrary to Pods' misleading implication otherwise. Rather, *Brown* supports Plaintiffs' assertion that false claims of deal scarcity are <u>not</u> "mere puffery," a benign designation "contrasted by representations of fact—*like the duration or availability of a promotion*, its terms and nature, the cost of goods, *and other facts Washington residents would depend on in making their consumer decisions*." *Brown*, 4 Wash. 3d at 596 (emphasis added). Here, the false (or misleading) "duration or availability" (*id.*) invoked by email headlines claiming "final hours" and "ends TONIGHT" is *material* to the consumer's decision-making process, described *infra*, Section III(B)(i). *See also* Compl., ¶¶ 30-37 (*e.g.*, these urgent calls to action are "psychologically effective" and "achieve[ ] a seller's aim to narrow the field of competitive products and deals").

Nor can Pods evade CEMA liability by minimizing its spamming scheme as a "rational and competitive business strategy," a blithe dismissal that is out of touch with caselaw and common sense. As the Ninth Circuit has emphasized, "spam is largely considered a nuisance and a source of frustration to e-mail users who. . . must wade through inboxes clogged with messages peddling assorted, and often unwanted, products and services. *The rising tide of spam poses an even greater problem to businesses, institutions, and other entities through network slowdowns, server crashes, and increased costs*." *Gordon*, 575 F.3d at 1044–45 (emphasis added).

### ii. Plaintiffs Sufficiently Alleged Pods' Knowledge of Email Recipients' Washington Residency.

Pods' assertion that Plaintiffs did not allege its knowledge of email recipients' residence fails. Mot., 7-8. Pods paints the pleadings as "speculation," ignoring that the Court must draw "all reasonable inferences in favor," *Littlejohn*, 2024 WL 4451955, at *3, of extensive allegations that

as a "sophisticated commercial enterprise," Pods knows of email recipients' Washington residency through, *e.g.*, tying email addresses to online purchases; tracking IP addresses of devices who open its emails[1]; the program ("Salesforce Marketing Cloud") used to manage its email campaigns; purchasing consumer data from brokers, who link emails to locations; and through "identity resolution" services, that connect emails to location. Compl., ¶¶ 65-73. These allegations are more than enough to allege that Pods knew it was emailing Washington residents.[2]

Pods further ignores the CEMA provision for a defendant's constructive knowledge where the "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address," RCW § 19.190.020(2), constructive knowledge that has been pled. *See* Compl., ¶ 72.

### B. Pods' Arguments that CEMA is Preempted Fail.

CEMA is not preempted by the federal CAN-SPAM Act, 15 U.S.C. §§ 7701–7713 ("Act"). The Act's plain text, its legislative history, the Ninth Circuit's decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), and cases decided before and after *Gordon* compel this conclusion. The Court need look no further than the plain text:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, *except to the extent that any such statute, regulation, or rule prohibits falsity **or** deception in any portion of a commercial electronic mail message or information attached thereto*.

---

[1] Pods questions the reliability of IP addresses—*one* method pled by Plaintiff—to determine location. Mot., 8. But its cases do not constitute *evidence* that IP addresses do not reliably geolocate devices. This wholly evidentiary assertion is inappropriate at this pleading stage.

[2] Even under heightened fraud claims—*not applicable* here—one need only plead a "strong inference" of knowledge. *See, e.g., New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) ("scienter" pled "by raising a strong inference" of "actual knowledge") (citation omitted). This makes sense: at the pleading stage, a plaintiff has little-to-no way of accessing what the defendant *knows*.

1    15 U.S.C. § 7707(b)(1) (emphases added).

2    Application of this plain text to CEMA is straightforward. CEMA prohibits sending

3    commercial email that "[c]ontains false or misleading information in the subject line." RCW

4    § 19.190.020(1)(b). By prohibiting "false or misleading" subject lines in commercial emails, *id.*,

5    CEMA "prohibits falsity or deception" in some part of or information attached to commercial

6    emails. 15 U.S.C. § 7707(b)(1). By its plain terms, therefore, the Act does not preempt Plaintiffs'

7    CEMA claims. Moreover, this "narrow" textual preemption analysis is "guided" by "a

8    presumption against supplanting the historic police powers of the States" unless "that [is] the clear

9    and manifest purpose of Congress." *Gordon*, 575 F.3d at 1060 (citations omitted). So, the idea is

10   to construe the plain text and limit that construction to Congress' manifestly clear purpose.

11   The legislative history is clear. The Report of the Senate Committee on Commerce,

12   Science, and Transportation described the effect of the Act's preemption as follows: "[A] State

13   law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain

14   format or contain specified content, would be preempted. By contrast, *a State law prohibiting*

15   *fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be*

16   *preempted*." S. Rep. No. 108-102, at 21 (emphasis added). The Senate Report makes clear that

17   Congress did not intend § 7707(b)(1) preemption to reach everything short of common law fraud,

18   and indeed expressly endorses the very claims brought here: claims based on "a State law

19   prohibiting … deceptive … subject lines … in commercial email." *Id.*

20   Court after court, before and after the Ninth Circuit's decision in *Gordon*, has concluded:

21   statutory and common law claims that attack "falsity and deception" (§ 7707(b)(1)) broadly in

commercial email are not preempted.[3] Attention to *Gordon*'s actual reasoning and holding, rather than loose citation to its dicta, reveals why. The question was "[w]hether the exception language of § 7707(b) permits states to prohibit e-mail activity that is *not* unfair or deceptive." 575 F.3d at 1062 n. 21. Unsurprisingly, the answer was no. *Gordon* involved CEMA's "point of origin" provision, which prohibits "misrepresent[ing] or obscur[ing] any information in identifying the point of origin or the transmission path" of commercial email. RCW § 19.190.020(1)(a); *see Gordon*, 575 F.3d at 1058. As construed by the court, CEMA's point-of-origin provision reaches "a vast array of nondeceptive acts and practices," including "unintentional clerical errors, imperfect representations, or immaterial misstatements." *Id.* at 1059 (quotations and citation omitted). The CAN-SPAM Act, by contrast, as interpreted in light of its text, structure, and purpose, *see id.* at 1061, does not authorize liability for "bare immaterial error," *id.* (quoting *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006)), or "immaterial inaccuracies or omissions." *Id.* at 1062. Rather, the Act restricts exempted state law to the field of "traditionally tortious or wrongful conduct." *Id.* (quoting *Omega*, 469 F.3d at 354).

Under this materiality standard, Gordon's claims were preempted. The Ninth Circuit found "nothing inherently deceptive" about "fanciful" domain names. *Gordon*, 575 F.3d at 1062, 1064 (domains were "properly registered" and permitted anyone to "accurately identif[y]" the

---

[3] *See, e.g.*, *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503 SC, 2009 WL 4723338, at *3-*4 (N.D. Cal. Dec. 4, 2009); *Asis Internet Servs. v. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 993 (N.D. Cal. 2009); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 944 (N.D. Cal. 2009); *Smith v. Anastasia Inc.*, 2014 WL 12577598, at *2–3 (S.D. Cal. Sept. 15, 2014); *Wagner v. Spire Vision*, 2014 WL 889483, at *3–4 (N.D. Cal. Mar. 3, 2014); *Balsam v. Trancos, Inc.*, 138 Cal. Rptr. 3d 108, 122 (Cal. Ct. App. 2012); *Hypertouch, Inc. v. ValueClick, Inc.*, 123 Cal. Rptr. 3d 8, 27 (Cal. Ct. App. 2011), Indeed, one district court *reversed* its prior decision in light of *Gordon*. *Hoang v. Reunion.com, Inc.*, No. C-08-3518 MMC, 2010 WL 1340535, at *4 (N.D. Cal. Mar. 31, 2010) (vacating pre-*Gordon* decision) (plaintiff "not required" to "additionally allege he relied to his detriment" on false or misleading statement to avoid preemption.).

registrant; fields not "altered to impair a recipient's ability to identify, locate, or respond" to sender and were not "aimed at misleading recipients" as to the sender's identity). The plaintiff asserted an inapposite requirement that defendant's or a client's full name "expressly appear" in "from" fields. *Id.* If CEMA imposed such a "labeling requirement," the court explained, it "clearly" fell outside the federal statute's exception from preemption. *Id.* So *Gordon* focused on the materiality of the alleged falsehood or deception, and on that question, the plaintiff's claims failed.

Decisions applying *Gordon* have correctly refused to overread it. Rather, district courts apply *Gordon* according to its terms: where plaintiffs plead only "nondeceptive statements or omissions," their claims are preempted. *See, e.g.*, *Andrews v. Conversion Squared Corp.*, 2020 WL 3978063, at *2–3 (C.D. Cal. May 8, 2020) ("Plaintiffs do not really allege deception, period, instead taking issue with a variety of missing information" in "from" fields.). Put differently, plaintiffs seeking to avoid preemption need only show some degree of materiality. *See Silverstein v. Keynetics Inc.*, 2016 WL 7475616, at *3–4 (N.D. Cal. Dec. 29, 2016), *aff'd*, 727 F. App'x 244, 246 (9th Cir. Mar. 6, 2018) ("The e-mails' use of the LinkedIn.com domain name is not materially false or misleading within the meaning of the CAN-SPAM Act.").

*Gordon* and the cases applying it thus explain the import of "traditionally tortious or wrongful conduct," 575 F.3d at 1062, in the preemption analysis, and give the lie to Pods' characterization of Plaintiffs' CEMA claims as attempts to impose "strict liability." *See* Mot., 2, 8-10, 14. To merit preemption, a defendant under *Gordon* has to show it didn't do anything *wrong*, in light of the state standard to be applied to its conduct, viewed against the backdrop of what has traditionally been considered wrongful. As the Supreme Court of Washington put it:

> The only burden [CEMA] places on spammers is the requirement of truthfulness, a requirement that does not burden commerce at all but

> actually facilitates it by eliminating fraud and deception. Spammers must use an accurate, nonmisleading subject line. . . . While spammers incur no costs in complying with the Act, they do incur costs for noncompliance, because they must take steps to introduce forged information into the header of their message.

*State v. Heckel*, 143 Wash. 2d 824, 836-37 (2001) (*en banc*).

Pods has not and cannot make that showing here. Pods does precisely what CEMA prohibits: it spams Washington residents with commercial emails containing "false or misleading information in the subject line," RCW § 19.190.020(1)(b), by misrepresenting what is perhaps the single most important fact to consumers—*price*—in a way exploits well-documented features of consumer psychology and distorts markets' proper functioning. Compl., ¶¶ 30-63.

### i.  Pods' Deceptions Are More Than Bare Immaterial Errors.

The only question, therefore, is whether it is "apparent from the face" of Plaintiffs' Amended Complaint, *Sams*, 713 F.3d at 1179, that the misrepresentations they complain of are merely "bare immaterial error[s]." *Gordon*, 575 F.3d at 1061 (quotations omitted). It is not. Plaintiffs are not complaining of "fanciful" domain names or "from" fields that fail an invented "labeling requirement." *Id.* at 1063–64. To the contrary, Plaintiffs complain of Pods' barrage of emails laden with false subject lines—*i.e.*, its false time-scarcity tactics. Those tactics are plainly material to the behavior of ordinary consumers.

As alleged, "[f]alse time scarcity claims harm consumers by manipulatively distorting their decision-making to their detriment." Compl. ¶ 35. As one report cited in the Complaint concludes, "[f]alse or misleading scarcity claims can change the behavior of consumers." Compl., ¶¶ 30, 32-34, 36-37 (citing U.K. Competition & Mkts. Auth., Online Choice Architecture—How Digital Design Can Harm Competition and Consumers 27 (2022)). Specifically, "[f]alse scarcity claims are psychologically effective because, as 'considerable evidence' suggests, 'consumers react to scarcity and divert their attention to information where they might miss opportunities.'"

Compl. ¶ 32 (citation omitted). One study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at ¶ 36 (citation omitted). *Littlejohn*, 2024 WL 4451955, at *3 (pled facts "accept[ed] as true" with "reasonable inferences [drawn] in favor" of Plaintiffs).

All of this accords with the well-worn federal law of materiality, not to mention common sense. "Whether in tort or contract law," materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025) (applying wire fraud statute). A fact is material "if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* (citation omitted). Representations about the timing and duration of sales and discounts are, at bottom, representations about prices. If a consumer is faced with the "FINAL HOURS! Last Chance to Save this Season" or "offer expires at midnight!", the consumer must decide whether to take advantage of the deal by purchasing within those "final hours" or before "midnight," after which she loses the opportunity. Compl., ¶¶ 50-52, 60-61; *see id.* at ¶¶ 39-62, Ex. A. And price is obviously a material fact—perhaps *the* material fact—affecting the behavior of consumers. *See* Compl. ¶¶ 32-34. If a consumer is in the market for a product or products she believes will cost more tomorrow, she will naturally "attach importance," *Kousisis*, 145 S. Ct. at 1396, to the fact that the price will be less if she purchases today.

As for common sense, Pods' argument flies in its face. Pods is a "sophisticated commercial enterprise" that has "engaged in persistent marketing through mass email campaigns across the United States." Compl. ¶ 64. Its email marketing platform ("Salesforce Marketing Cloud") enables it to, *inter alia*, track how many recipients engage with its marketing materials

and to what extent. *See id.* ¶ 68. And email subject lines offer limited space within which Pods can communicate "above the fold" messages that come to consumer attention even if the emails are immediately deleted or their contents ignored. Why, then, would Pods choke its consumers' inboxes like coffee grounds in a clogged sink with email after email announcing "FINAL HOURS! Last Chance to Save this Season" or "offer expires at midnight"? Why would Pods expend all this time and effort broadcasting mere immaterialities? The only plausible answer is, of course it would not. Pods would not waste valuable marketing dollars on marketing messages unless they worked. And Pods' false-urgency tactics work because they exploit well-documented features of consumer psychology and behavior. *See id.* at ¶¶ 30-63. In other words, Pods' tactics work because they misrepresent facts to which consumers "attach importance." *Kousisis*, 145 S. Ct. at 1396. Nothing in the CAN-SPAM Act or *Gordon* requires more to avoid preemption.

In any event, materiality is a complex mixed question of law and fact "typically … resolved by juries." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). Any doubts as to the materiality of Pods' misrepresentations are therefore to be doubly resolved against Pods: once because it is not Plaintiffs' burden to plead materiality, but Pods' burden to show Plaintiffs have pleaded themselves out of court with immaterialities, *see Sams*, 713 F.3d at 1179; and twice because Plaintiffs should be afforded the benefit of fact and expert discovery to demonstrate the plausible inference that Pods sends its misleading email subject lines precisely to impact consumer behavior. Indeed, at this stage, the Court must draw reasonable inferences in Plaintiffs' favor. *See Littlejohn*, 2024 WL 4451955, at *3.

### ii. CAN-SPAM'S Preemption Exception Extends to CEMA's Prohibition Against "Misleading" Content in Email Subject Lines.

In an argument that itself relies on misleading case construction, Pods asserts that CEMA's use of "misleading" places it outside the CAN-SPAM preemption exception for state

laws that "prohibit falsity or *deception*" (§ 7707(b)(1)). Mot., 1, 9-11. This assertion hardly passes the smell test, failing under ordinary comparison of the terms' definitions. *Compare* Merriam-Webster, "Deceptive" (listing "misleading" as a synonym)[4] *with id.* (listing "deceive" as a synonym for "mislead").[5] Moreover, in support of this assertion, Pods misleadingly implies Ninth Circuit support (Mot., 10), citing the court's inapposite summary of a state appellate decision regarding the terms "*misrepresent*" and "obscure," *not* the term "mislead." *Gordon,* 575 F.3d at 1059 (quoting *Benson v. Oregon Processing Service, Inc.*, 136 Wash. App. 587 (2007)). Indeed, the dictionary definition of "mislead"—"to lead in a wrong direction or into a mistaken action or belief **often by** deliberate **deceit**"[6]—itself demonstrates the misdirection employed by Pods here.

Nor does Congress' interchangeable use of "misleading" and "deceptive" provide Pods the support it seeks. Take 15 U.S.C. § 7704(a)(2), cited by Pods, as an example. Under the *heading* for "prohibition of **deceptive** subject headings," Congress defines such "subject headings" as including those that "would be likely to **mislead** a recipient." *Id.* Further, in the congressional findings supporting CAN-SPAM (cited by Pods), Congress found that "unsolicited" commercial emails often contain "fraudulent or *deceptive*" messaging "in one or more respects," messaging that *includes* emails with "*misleading* information" in the subject lines. *Id.* at § 7701(2), (8). Pods absurdly points to the separate mention of these terms, ignoring that they are referenced interchangeably, and myopically avoids this statutory context. *See Cazarez-Guiterrez v. Ashcroft*, 382 F3d 905, 912 (9th Cir. 2004) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

Moreover, this notion that "misleading" is materially distinct from "deceptive" is directly

---

[4] https://www.merriam-webster.com/dictionary/deceptive (accessed January 7, 2026).
[5] https://www.merriam-webster.com/dictionary/misleading (accessed January 7, 2026).
[6] *Id.*

undermined by the *Brown* decision construing this very language. 4 Wash. 3d at 590 (construing RCW 19.190.020(1)(b)). Sitting *en banc*, the court looked to the interplay between Washington's CPA, which prohibits, *inter alia*, "unfair or deceptive acts or practices," and CEMA, which "targets a *specific deceptive commercial practice*: sending Washington residents commercial e-mails that contain 'false or *misleading* information in the subject line[s].'" *Id.* at 591 (emphasis added); *see also id.* at 592 (explaining, the CEMA prohibited activity of "sending commercial e-mails with false *or misleading* subject lines," is "a particular type of ***deceptive*** commercial activity" (emphasis added)). This construction of CEMA's use of "misleading" as a literal form of the "deceptive" conduct prohibited by the CPA ends the inquiry. *See Gordon,* 575 F.3d at 1059 (statutory interpretation demonstrating that CEMA "conform[s] with federal legislation," is a "task [that] is [ ] a matter for the State, as sovereign, to resolve").

As this Court very recently found: "Because CEMA's subject-line provision forbids only false or ***misleading*** information (*i.e.*, 'falsity or ***deception***'), it is not preempted by CAN-SPAM." *Harrington v. Vineyard Vines, LLC*, No. C25-1115 TSZ, 2025 WL 3677479, at *1 (W.D. Wash. Dec. 18, 2025) (citing *Gordon*, 375 F. Supp. 2d at 1045–46) (emphasis added); *see also Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1011 (W.D. Wash. 2019) (noting that CEMA "protect[s] concrete interests *in being free from **deceptive** commercial e-mails*" and that the "prohibition" in CEMA against "sending commercial e-mails with false or misleading subject lines. . . *creates a substantive right to be free from **deceptive** commercial e-mails*") (emphasis added).

Not only does Pods misleadingly characterize the application of *Gordon* here; its construction of the term "misleading" ignores the term's plain meaning and governing case law demonstrating it is synonymous with "deceptive." This is no basis for preemption.

### iii.  Pods' Non-Existent Preemption Standard Does Not Apply.

Second, Pods constructs a made-up, torturous standard, purportedly under *Gordon*, to assert that Plaintiffs' CEMA claim must meet the elements of a CAN-SPAM Act claim. Mot., 11-14. Nowhere in *Gordon* does the court state (or even imply) that the Act's preemption exception requires an affirmative claim under the CAN-SPAM Act. *See generally Gordon*, 575 F.3d 1040. Rather, the court's analysis of the CAN-SPAM exception for state laws prohibiting "falsity or deception" in spam email found that those terms incorporate a materiality element, one that is plainly invoked under CEMA and Plaintiffs' claims here. *See supra* Section III(B)(i).

Nor does the court's reference to "traditionally tortious or wrongful conduct" invoke the elements of common law tort theories, like, *e.g.* fraud.[7] As described *supra* Section III(B)(i), *Gordon* and its progeny stand for the inherent incorporation of materiality under common law tort theories to invoke preemption. They do not stand for an explicit adoption of the elements of a *different* law or standard other than that invoked by the exempted state law itself.[8] *Gordon*, at 575 F.3d at 1063. Otherwise, as the court in *Consumerbargaingiveaways* reasoned: the disjunctive use of "falsity or deception" from the CAN-SPAM state law exception would be obliterated. 622 F. Supp. 2d at 942. The disjunctive references to "falsity *or* deception" in fact, "suggest[s] [a] broader application," not one "limited *just* to common-law fraud and other similar torts." *Id.*

So Pods is wrong that Plaintiffs are required to prove "actual knowledge" that its subject

---

[7] *See, e.g.*, *Asis Internet Servs.*, 2009 WL 4723338, at *3 (no "need to plead reliance and damages in order to avoid preemption"); *Asis Internet Servs*, 617 F. Supp. 2d at 993 ("declin[ing]" to "restrict . . . 'falsity or deception' to encompass only common-law fraud"); *Consumerbargaingiveaways*, 622 F. Supp. 2d at 944 (same); *Smith*, 2014 WL 12577598, at *2–3 (same); *Wagner*, 2014 WL 889483, at *3–4 ("showing of reliance and damages" is "not necessary"); *Hypertouch*, 123 Cal. Rptr. 3d at 27 (same); *Hoang*, 2010 WL 1340535, at *4 ("not required" to "allege he relied to his detriment" on false or misleading statement).

[8] For this reason, Pods' citation to the court's invasion of privacy analysis in *Adams v. King Cnty.*, 164 Wash. 2d 640 (2008) has no bearing here. *Id.* at 662.

lines were false or deceptive. Mot., 12. Nonetheless, a demonstrably reasonable inference from pleadings that Pods asserted "FINAL HOURS!", "Ends TONIGHT" and "expires at midnight!" as to deals it continued days later is that Pods *knew* the deal would be "extended." Compl., ¶¶ 39-63. Otherwise, how could it systematically implement the very deals it was advertising, and then advertise those deals to consumers across the U.S.? *Id.* at ¶ 64 (Pods is a "sophisticated commercial enterprise" "engaged in persistent marketing through mass email campaigns across the United States"). In any event, Plaintiffs' claims under CEMA or the CPA do not alleging intent. *See Wright v. Lyft, Inc.*, 406 P.3d 1149, 1153–55 (Wash. 2017) (delineating elements of CPA and CEMA claims, none requiring intent).

Pods is likewise wrong that Plaintiff was required to demonstrate "actual harm." Mot., 14 (citing the Ninth Circuit's analysis of the plaintiff's *separate, affirmative claim under the CAN-SPAM Act, Gordon*, 575 F.3d. at 1054). As the state's high court has emphasized: "CEMA does not require a showing of [actual] injury for statutory damages to be awarded *because the injury is receiving the e-mail that violates CEMA*." *Brown*, 4 Wash. 3d at 592 (emphasis added). Pods takes a dim view of the statutory damages imposed by CEMA for its conduct, Mot., 11-14, but that does not make CEMA a strict liability statute.

And as discussed *supra* Section III(B)(i), Plaintiffs' CEMA allegations invoke false time-scarcity tactics plainly material to the behavior of ordinary consumers. Where Plaintiffs have alleged "considerable evidence" that false scarcity assertions trigger "consumers' react[ion] to scarcity" and the "diver[sion] [of] their attention to information where they might miss opportunities,'" Compl. ¶ 32, in the context of Pods' representations that a particular deal "Ends TONIGHT" or "expires at midnight!" *id.* at ¶¶ 39-63, there is no question of materiality. *Kousisis*, 145 S. Ct. at 1396 (2025) (materiality focuses on "the effect on the likely or actual behavior of

1      the recipient of the alleged misrepresentation").

2          Further, Pods ignores ample pleadings demonstrating that its false scarcity messages were

3 material to them, including that Plaintiffs received emails with the headlines, as to Plaintiff

4 Hutton, "FINAL HOURS" for a deal that was "BACK" the very next day (Compl., ¶¶ 50-52, 75)

5 and "Last Day" for a deal that magically became available again a week later (*id.* at ¶¶ 54-56, 75),

6 as to both Plaintiffs, "This offer expires at midnight!" for a deal that continued the very next day

7 (*id.* at ¶¶ 60-61, 75) and as to Plaintiff Rice, "Final hours" for a deal that was available just over

8 a week later and again the next month. *Id.* at ¶¶ 43-45, 75. Plaintiffs are consumers; these

9 messages invoke the very time scarcity they have pled as material to their decision-making and

10 purchasing behavior, and there is no requirement to plead reliance. *See supra* p. 17 & n. 7.

11          In any event, the question is not whether any particular Plaintiff changed their behavior in

12 response to any particular email, but whether Pods' misrepresentations would have an "effect on

13 the *likely … behavior*" of its recipients. *Kousisis*, 145 S. Ct. at 1396 (emphasis added); *see also*

14 *id.* ("[A] misrepresentation is material if a reasonable person *would attach* importance to it in

15 deciding how to proceed, or if the defendant knew (or should have known) that the recipient *would*

16 *likely* deem it important." (emphasis added)).

17          Pods' inapposite *fraud* cases do not counsel otherwise,[9] and the court's decision on the

18

19          [9] Nearly all of Pods' cases are about fraud. *See, e.g.*, *Elcon Const., Inc. v. E. Washington*

20 *Univ.*, 174 Wash. 2d 157, 166-167 (2012) (under *fraudulent inducement* claim, court found the alleged misrepresentations in a report "*not relevant*" to the underlying contract); *Martin v. Miller*,

21 24 Wash. App. 306, 309 (1979) (on *fraud claim*, plaintiff must show that "representations were material to the plaintiffs' decision to enter into a purchase and marketing agreement with the

22 defendant"); *Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164, 1169 (9th Cir. 2023) (quoting the "procedural history" portion of a decision regarding a False Claims Act

23 challenge, where the jury was asked to assess, *inter alia*, "whether 'the false or fraudulent aspect of the claim' was 'material to [the plaintiff's] decision-making'"); *Isomedia, Inc. v. Spectrum*

25 *Direct, Inc.*, No. C08-1733JLR, 2009 WL 10676391, at *4 (W.D. Wash. May 27, 2009) (on *fraud* claim, allegation was not sufficient to meet *inapposite* reliance requirement).

26 PLAINTIFFS' BRIEF IN OPPOSITION          17
TO DEFENDANT'S MOTION

27 TO DISMISS COMPLAINT

CPA claim in *Brummett* largely turned on the plaintiff's failure to "target the creator of this alleged deception," who was not the defendant. *Brummett v. Washington's Lottery*, 171 Wash. App. 664, 678 (2012). Moreover, the single-sentence finding that the phrase "going fast" was not materially deceptive, *id.*, is refuted by the later holding by the Supreme Court of Washington that "'representations of fact[s]–*like the duration or availability of a promotion. . .* and other facts on which Washington residents would depend 'in making their consumer decisions'–are subject to CEMA's subject-line standards." *Harrington*, 2025 WL 3677479, at *1 (quoting *Brown*, 4 Wash. 3d at 595–96); *see also Stephens v. Omni Ins. Co.*, 159 P.3d 10, 19 (Wash. Ct. App. 2007) ("The increasingly urgent tone ('ATTENTION!') and message ('ACTIVITY PENDING TEN (10) days') [of defendant's dunning letters] suggests that the recipient's situation is becoming worse with each passing day when in fact there is no urgency."). There is no CEMA preemption under the CAN-SPAM Act.

## C. Plaintiffs' CEMA Claims are not Preempted by the Dormant Commerce Clause.

Constitutional challenges usually rest on what the Constitution says. Pods, by contrast, seeks invalidation of a duly enacted state statute on the basis of what the Constitution does *not* say. "[E]xtreme caution is warranted before a court deploys this implied authority." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023), *aff'g* 6 F.4th 1021 (9th Cir. 2021). States lack the power to "discriminate against interstate commerce" or "impose undue burdens on interstate commerce." *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). "Although it is not a clause in the Constitution," this doctrine is called the "dormant" Commerce Clause. *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025). It is practically moribund. *See Pork Producers*, 6 F.4th at 1033 ("While the dormant Commerce Clause is not yet a dead letter, it is moving in that direction.").

"[T]he Framers equipped Congress with considerable power to regulate interstate

commerce and preempt contrary state laws." *Pork Producers*, 598 U.S. at 390. In the CAN-SPAM Act, Congress exercised just that power. Congress considered the appropriate balance of state and federal power, specifically in light of "the inherently interstate nature of e-mail communications," S. Rep. No. 108-102, at 21, and enacted the Act's preemption provision to address it. Congress struck the balance by expressly declining to preempt state laws, like CEMA, that prohibit "falsity or deception," 15 U.S.C. § 7707(b), while saying nothing about any purportedly "extraterritorial impacts" such rules might have. *Cf. Pork Producers*, 598 U.S. at 390 ("[V]irtually all state laws create ripple effects beyond their borders.").

Dissatisfied with the choices Congress actually made, Pods now invites the Court to invalidate CEMA on the basis of Congress's power to choose differently. This "incautious invitation[]" should be declined. *Id.* at 391.

As to whether Congress' power to regulate interstate commerce prohibits Washington from protecting its residents against deceptive commercial spam, the answer is no. The Supreme Court's recent decision in *Pork Producers* "substantially clarified" the meaning and import of cases (like *Healy v. Beer Institute*, 491 U.S. 324 (1989) and *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), relied on by Pods, Mot. 2, 15, 20, 22) invoking this principle of dormant Commerce Clause jurisprudence. *Flynt v. Bonta*, 131 F.4th 918, 924 (9th Cir. 2025). To begin with, the Court "unanimously disavow[ed]," the "virtual[] *per se* invalid[ity]" rule proffered by Pods (Mot. 15, 22). *Pork Producers*, 598 U.S. at 389 n. 4.

The Court clarified that the "antidiscrimination" principle at the "very core" of the Dormant Commerce Clause "principally 'prohibits the enforcement of state laws *driven by* [ ] economic protectionism—that is, regulatory measures *designed to benefit in-state economic interests by burdening out-of-state competitors*." *Flynt*, 131 F.4th at 924 (quoting *Pork Producers*, 598 U.S. at

369) (emphasis added). Thus, a statute is not unconstitutional without the "*specific* impermissible extraterritorial effect" of "prevent[ing] out-of-state firms from undertaking competitive pricing or depriv[ing] businesses and consumers in other States of whatever competitive advantages" they had. *Id.* (quoting *Pork Producers*, 598 U.S. at 374) (quotations omitted). These cases enforce the prohibition on "impermissible discriminatory purpose[s]," *not* "any broader, freestanding extraterritoriality principle." *Id.* (citing *Pork Producers*, 598 U.S. at 373).

Take *Healy* itself. It involved a statute that "required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States." *Pork Producers*, 598 U.S. at 372. This protectionism was out in the open and uncontested: the statute did not "even try to cloak its discriminatory purpose" in applying only to "interstate firms" and so "clearly discriminated against interstate commerce." *Id.* at 373 (quotations omitted).

*Healy* and the other extraterritoriality cases are nothing like this one. The sole "extraterritorial impact" Pods alleges here is the speculative, hypothetical, and at any rate, irrelevant possibility that a Washington resident might happen to be out-of-state when she receives a false or misleading commercial email from Pods. *See* Mot. 14–19. There is nothing like the "*specific*" discriminatory effects condemned by *Healy* and cases like it, *Flynt*, 131 F.4th at 924, and indeed no discriminatory or protectionist effect of any kind. The negative implications of the Commerce Clause simply do not enforce "any broader, freestanding extraterritoriality principle" that the Pods hypothetical might be supposed to violate. *Id.*; *see also id.* at 929 (same).[10]

---

[10] Pods points out that Plaintiffs do not allege they were within Washington when they received any particular email. *See* Mot. 19. Even if that fact were constitutionally relevant (it is not), again, Pods gets the pleading burdens backwards. It is not Plaintiffs' burden to anticipate, refute, or "plead around" Pods' affirmative defense. *U.S. Commodity Futures Trading Comm'n v. Monex Cred. Co.*, 931 F.3d 966, 972 (9th Cir. 2018). Having elected to raise its CAN-SPAM defense under Rule 12(b)(6), it is *Pods'* burden to show that it is "apparent from the face" of Plaintiffs' complaint that Pods is entitled to dismissal. *Sams*, 713 F.3d at 1179.

1    Nothing in *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (*en*

2    *banc*), relied on by Pods, Mot. 15-18, requires a different result. That case dealt with a California

3    statute requiring payment of royalties to artists from sales of their art "whenever the seller resides

4    in California or the sale takes place in California." *Id.* at 1323 (quotations omitted). The majority

5    held in relevant part that the royalty requirement "violate[d] the dormant Commerce Clause" when

6    "applied to out-of-state sales by California residents." *Id.* at 1323.

7    To begin with, the holding of *Sam Francis* did not survive *Pork Producers*. *See Flynt*, 131

8    F.4th at 931 (noting question as open). As the dissent presciently observed, in *Healy* and the other

9    extraterritoriality cases, "the laws at issue … had a direct effect on out-of-state commercial

10    transactions by regulating the price or terms of such transactions, or by otherwise requiring an out-

11    of-state merchant to seek regulatory approval in one State before undertaking a transaction in

12    another." *Sam Francis*, 784 F.3d at 1331 (Reinhardt, J., dissenting in part) (citation omitted). In

13    other words, "cases like *Healy* … turned on an impermissible discriminatory purpose against out-

14    of-state economic interests, not any freestanding extraterritoriality principle." *Flynt*, 131 F.4th at

15    929. The *Sam Francis* majority, by contrast, sought to enforce this "broader, freestanding

16    extraterritoriality principle" that *Pork Producers* disfavors. *See Flynt*, 131 F.4th at 931 (citing *Pork*

17    *Producers*, 598 U.S. at 373).

18    In sum, Pods' assumption that any restrictions CEMA may impose on an out-of-state

19    company—from, notably, using false or misleading messaging in its spam emails—violates the

20    Dormant Commerce Clause is undermined by its reliance on clarified, even overruled, precedent.[11]

21

22    [11] None the cases cited by Pods in support of its position come after *Pork Producers*. Mot.,
16-7. Unsurprisingly, they all reflect this "freestanding extraterritoriality principle" that *Pork*
23    *Producers* rejects (*Flynt*, 131 F.4th at 931). *See, e.g., Hartman v. United Bank Card, Inc.*, 291
F.R.D. 591, 598 (W.D. Wash. 2013) (noting, "[a] prohibited extraterritorial law is one in which

25

26    PLAINTIFFS' BRIEF IN OPPOSITION                   21
      TO DEFENDANT'S MOTION
27    TO DISMISS COMPLAINT

1    *Cf. Pork Producers*, 598 U.S. at 390 ("[V]irtually all state laws create ripple effects beyond their

2    borders.").

3        But even a full-throated reading of *Sam Francis* cannot save Pods, because it is readily

4    distinguishable. First, Washington plainly has a legitimate interest in protecting its residents from

5    conduct Washington deems harmful or undesirable. *See Edgar v. MITE Corp.*, 457 U.S. 624, 644

6    (1982) ("[P]rotecting local investors is plainly a legitimate state objective"); *Heckel*, 143 Wash. 2d

7    at 835 (*en banc*) (discussing harms from "[d]eceptive spam" to "individual Internet users"

8    protected against by CEMA). No such interest was served by the California statute in *Sam Francis*,

9    which protected artists' rights to royalties no matter where they resided. 784 F.3d at 1323 (faulting

10   statute for purporting to apply "even if the [artwork], the artist, and the buyer never traveled to, or

11   had any connection with, California"). CEMA requires a much closer connection to Washington

12   than the statute in *Sam Francis* required to California. *See id.* at 1324 ("[N]o other connection to

13   California need exist" besides the seller's residence).

14       Second, Pods' focus on the consumer's location ignores the meaningful difference between

15   a "commercial transaction" with the intangible spam email at issue here and the sales of tangible

16   goods at issue in *Sam Francis*. In the latter case, the transaction may be consummated at the instant,

17   and particular time and place, goods are exchanged for payment. It is thus in principle "a

18   commercial transaction that 'takes place wholly outside of the State's borders.'" *Sam Francis*, 784

19   F.3d at 1323 (quoting *Healy*, 491 U.S. at 336). Intangible commercial spam, by contrast—

20

21   the practical effect of the regulation is to control conduct beyond the boundaries of the
     State" (quoting *Healy,* 491 U.S. 324 at 336); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL

22   1466247, at *14 (W.D. Wash. Mar. 30, 2015) (quoting *Healy*, 491 U.S. 324 at 336 for the
     proposition that a statute that "controls commerce occurring wholly outside the boundaries of a

23   State exceeds the inherent limits of the enacting State's authority and is invalid *regardless of
     whether the statute's extraterritorial reach was intended by the legislature*" (emphasis added));

25   *Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 175 (S.D.N.Y. 1997) (same).

26   PLAINTIFFS' BRIEF IN OPPOSITION                    22
     TO DEFENDANT'S MOTION

27   TO DISMISS COMPLAINT

1    particularly in light of "the inherently interstate nature of e-mail communications," S. Rep. No.

2    108-102, at 21—may exist and have effects in several places at once, chief among them the home

3    state of the recipient, no matter where she happens to be located. For example, the deceptive spam

4    Pods might send to a hypothetical, temporarily out-of-state Washington resident might arrive both

5    on the phone she carries and on her desktop at home in Washington. Perhaps a hypothetical traveler

6    forgets to check her email while traveling or forgets her phone at home, such that she does not

7    actually view Pods' deceptive spam until she's back in Washington. Perhaps she reads Pods'

8    deceptive spam while out-of-state but hurries home to make a purchase before Pods sale "ends."

9    The point is clear: Washington's interest in protecting its residents from commercial spam,

10   irrespective of where those residents are at any given time, cannot be analogized to California's

11   interest in regulating "a commercial transaction that 'takes place wholly outside of the State's

12   borders.'" *Sam Francis*, 784 F.3d at 1323 (quoting *Healy*, 491 U.S. at 336).

13        Even within the terms of the "freestanding extraterritoriality principle," *Flynt*, 131 F.4th at

14   929, disavowed by *Pork Producers* but enforced by *Sam Francis*, Pods has simply failed to explain

15   why it should matter where a Washington resident happens to be located at the particular moment

16   when Pods presses "Send" on a piece of deceptive spam addressed to her, as the Supreme Court

17   of Washington made clear in *Heckel*: CEMA "does not burden interstate commerce by regulating

18   when or where recipients may open the proscribed … messages." 143 Wash. 2d at 839 (rejecting

19   extraterritoriality challenge); *see also MaryCLE, LLC v. First Choice Internet, Inc.*, 890 A.2d 818,

20   842 (Md. Ct. Spec. App. 2006) (cited by Defendant, Mot., 17) ("MCEMA does not regulate

21   exclusively extraterritorial conduct because its focus is not on when or where recipients may open

22   the proscribed ... messages." (quotations omitted)).

23        What matters is Washington's interest in protecting Washington residents. *See Edgar*, 457

25

U.S. 624 at 644; *Heckel*, 143 Wash. 2d at 839 ("[T]he Act addresses the conduct of spammers in targeting Washington consumers."); *MaryCLE*, 890 A.2d at 842–43 ("[T]he Act addresses the conduct of spammers in targeting Maryland consumers." (quotations omitted)).

### D. The Supreme Court of Washington's Decision in *Heckel* Directly Refutes Pods' Assertions Regarding Local Interests and Burden.

Pods attempts to render moot the contrary finding in *Heckel*, Mot., 18-19, by entirely ignoring the court's extensive findings to misleadingly assert that the decision "tacitly" acknowledged its position that CEMA is unconstitutional. *Id.*  Rather, the court's extensive findings and thorough analysis directly undermine Pods' positions (*id.* at 20-22) regarding the local interests that CEMA serves and the purported extraterritorial burden it imposes. Indeed, the court found: (1) CEMA is not facially discriminatory ("applies even-handedly to in-state and out-of-state spammers");  (2) CEMA  serves a "legitimate local purpose," *e.g.*, against the well-documented "problems that spam causes"; and perhaps most notably, (3) "the only burden the Act places on spammers is the requirement of truthfulness, *a requirement that does not burden commerce at all* but actually facilitates it by eliminating fraud and deception." *Heckel*, 143 Wash. 2d at 836 (citation omitted) (emphasis added). Finally, the court made the holding—a dispositive one, under the later, clarifying lens of *Pork Producers*—that CEMA does not "violate the extraterritoriality principle in the dormant Commerce Clause analysis," as  "there is no 'sweeping extraterritorial effect' that would outweigh the local benefits of the Act." *Id.* at 839 (citing *Edgar*, 457 U.S. at 642).

Pods' assertions that CEMA violates the Dormant Commerce Clause directly contravene governing decisions by the U.S. Supreme Court, the Ninth Circuit, and the Supreme Court of Washington. Its extraterritoriality arguments fail.

### E.  Plaintiffs' CPA Claim Survives.

Pods' only argument for dismissal of Plaintiffs' CPA claims is that they stand or fall with Plaintiffs' CEMA claims. *See* Mot., 22. As Plaintiffs' CEMA claims survive for the reasons given above, so too do their CPA claims.

### F.  Plaintiffs Have Pled Injury Under CEMA, and Pods' Attempt to Dismiss Actual and Treble Damages is Premature.

Finally, "[u]nder CEMA, the injury is receiving an e-mail that violates its regulations," *Brown*, 4 Wash. 3d at 584, an injury that has been amply pled. *See* Compl. ¶¶ 39-63, 74-77. Moreover, "[it] would be premature to strike or dismiss the request for treble damages prior to further development of the factual record on the issue." *Daniel v. Lennar Corp.*, No. 819CV00452JLSDFM, 2019 WL 8194735, at *5 (C.D. Cal. Oct. 16, 2019) ("[W]hen a plaintiff states a claim, the appropriate form of relief is not to be decided upon a motion to dismiss." (citations omitted)); *see also Shade v. Gorman*, No. C 08-3471 SI, 2009 WL 196400, at *2 (N.D. Cal. Jan. 28, 2009) (finding dismissal of actual damages claim and injunctive relief claims "premature"; noting, "[t]he complaint simply seeks actual damages to be proven at the time of trial. If plaintiff prevails on the [ ] claim, the Court will address the issue of damages at that time").

## IV.  <u>CONCLUSION</u>

The Court should deny Pods' motion to dismiss.

1    Date: January 9, 2026                    Respectfully submitted:

2                                              */s/ Samuel J. Strauss*
                                              Samuel J. Strauss, WSBA No. #46971
3                                             Raina C. Borrelli*
                                              **STRAUSS BORRELLI PLLC**
4                                             980 N. Michigan Avenue, Suite 1610
                                              Chicago, IL 60611
5                                             Tel.: (872) 263-1100
                                              Facsimile:  (872) 263-1109
6                                             sam@straussborrelli.com
                                              raina@straussborrelli.com
7
                                              **I certify that this memorandum contains 8,254**
8                                             **words in compliance with the Local Civil Rules.**

9                                             Lynn A. Toops *(pro hac vice)*
                                              Natalie A. Lyons*
10                                            Ian R. Bensberg*
                                              **COHENMALAD, LLP**
11                                            One Indiana Square, Suite 1400
                                              Indianapolis, IN 46204
12                                            Tel.: (317) 636-6481
                                              ltoops@cohenmalad.com
13                                            ibensberg@cohenmalad.com

14                                            Gerard J. Stranch, IV*
                                              Michael C. Tackeff *(pro hac vice)*
15                                            Andrew K. Murray*
                                              **STRANCH, JENNINGS &**
16                                            **GARVEY, PLLC**
                                              223 Rosa L. Parks Avenue, Suite 200
17                                            Nashville, TN 37203
                                              Tel.: (615) 254-8801
18                                            gstranch@stranchlaw.com
                                              mtackeff@stranchlaw.com
19                                            amurray@stranchlaw.com

20                                            *Attorneys for Plaintiffs*

21                                            **\* Applications for admission *pro hac vice* forthcoming**

22

23

25

26    PLAINTIFFS' BRIEF IN OPPOSITION              26
      TO DEFENDANT'S MOTION
27    TO DISMISS COMPLAINT

1

## <u>CERTIFICATE OF SERVICE</u>

2       I, Samuel J. Strauss, hereby certify that on January 9, 2026, I caused the foregoing to be

3   electronically filed with the Court using the Court's CM/ECF system which will send an

4   electronic copy to all parties and/or their counsel of record.

5       DATED this 9th day of January, 2026.

6                                           */s/ Samuel J. Strauss*
                                            Samuel J. Strauss, WSBA No. #46971
7                                           **STRAUSS BORRELLI PLLC**
                                            980 N. Michigan Avenue, Suite 1610
8                                           Chicago, IL 60611
                                            Tel.: (872) 263-1100
9                                           Facsimile:  (872) 263-1109
                                            sam@straussborrelli.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

25

26